USDC- BALTIMORE
'22 OCT 13 AM8:28

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Paul E. Budlow*
*Assistant United States Attorney*
*Paul.Budlow@usdoj.gov*
JTM 08.25.22

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4917*
*MAIN: 410-209-4800*
*FAX: 410-962-3091*

August 28, 2022

Andrew R. Szekely, Assistant Federal Public Defender
Federal Public Defender's Office
Northern Division
Tower II, Ninth Floor
100 South Charles Street
Baltimore, MD 21201-2705

Re: *United States v Clayton Alexander McCoy*
Criminal #: ~~CCB~~ SAG-21-0075

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Clayton Alexander McCoy, (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by Friday, September 9, 2022, at 5:00 pm, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offenses of Conviction

1. The Defendant agrees to plead guilty to Counts One and Four of the Indictment now pending against him, charging him with Transporting Explosives with Intent to Injure, in violation of 18 U.S.C. § 844(d); and Possession of an Unregistered Firearm/Explosive Device, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. The Defendant admits that he is, in fact, guilty of those offenses and will so advise the Court.

Elements of the Offenses

Count One: Transporting Explosives with Intent to Injure:

2. The elements of Count One to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

That on or about the time alleged in the Information, in the District of Maryland:

a. The Defendant transported or received, or attempted to transport or receive;

b. Any explosive;

c. In interstate or foreign commerce;

d. With the knowledge or intent that it would be used to kill, injure, or intimidate any individual; or unlawfully used to damage or destroy any building, vehicle, or other real or personal property; and

e. Personal injury resulted to any person as a direct or proximate result of the conduct.

Count Four: Possession of an Unregistered Firearm/Explosive Device:

3. The elements of Count Four to which the Defendant has agreed to plead guilty and which this Office would prove if the case went to trial, are as follows:

That on or about the time alleged in the Information, in the District of Maryland:

a. That the Defendant knowingly possessed a National Firearms Act firearm;

b. That the firearm was a destructive device/explosive bomb as defined in 26 U.S.C. § 5845(a) & (f);

c. That the Defendant knew of the characteristics of the firearm, that is, that it was a destructive device/explosive bomb;

d. That the firearm was in operating condition; and

e. That the firearm was not registered to the Defendant in the National Firearms Registration and Transfer Record.

Penalties

4. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Maximum Imprisonment | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 844(d) | 20 years | 3 years | $250,000 | $100 |
| 4 | 26 U.S.C. §§ 5841, 5861(d), and 5871 | 10 years | 3 years | $250,000 | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

5. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

   h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

7. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree to the following Sentencing Guidelines:

Count One: Transporting Explosives with Intent to Injure:

a. The applicable base offense level for Transporting Explosives with Intent to Injure is 16. U.S.S.G. § 2K1.3.

b. The underlying unlawful conduct is attempted murder, thus the applicable base offense level is 33. U.S.S.G. §§ 2A2.1(a)(1), 2K1.3(c)(1)(B) & 2X1.1 (c)(1).

c. There is a 2 level enhancement because the injury involved extreme physical pain and required medical intervention including surgery, hospitalization, and physical rehabilitation and was therefore "serious bodily injury. U.S.S.G. §§ 2A2.1(b)(1) & 1B1.1 (Application Note 1(M)). [SUBTOTAL 35].

Count Four: Possession of an Unregistered Firearm/Destructive Device:

d. The applicable base offense level for Possession of an Unregistered Firearm/Destructive Device is 20 because the offense involved a firearm that is described in 26

U.S.C. § 2845(a) and the Defendant was a prohibited person at the time the Defendant committed the instant offense. U.S.S.G. § 2K.2.1(a)(4) (B).

e. There is a 2 level enhancement because the offense involved a destructive device. U.S.S.G. § 2K.2.1(b)(3)(B). [SUBTOTAL 22].

f. There is a 4 level enhancement because the Defendant possessed the firearm in connection with another felony offense or with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense. U.S.S.G. § 2K2.1(b)(6)(B). [SUBTOTAL 26].

8. This Office and the Defendant do not agree that Counts One and Four group. Regardless because the offense level for Count Four is 9 or more levels less serious than the offense level for Count 1, the guidelines calculation is not impacted by the grouping rules, U.S.S.G. §§ 3D1.1 through 3D1.4.

9. This Office and the Defendant agree that the following sentencing guidelines factors are in dispute:

a. Whether an aggravating circumstance exists pursuant to U.S.S.G. §§ 5K2.0, 5K2.5, and 5K2.6, justifying an upward departure above the advisory USSG range.

Acceptance of Responsibility:

10. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

11. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

12. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

13. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a).

14. This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

15. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever lawful sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

16. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable

to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

17. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

18. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

19. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

20. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Restitution

21. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable

steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Defendant's Conduct Prior to Sentencing and Breach

22. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

23. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

24. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

24. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Baron
United States Attorney

By: [signature]
Paul E. Budlow
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9/20/22
Date

[signature]
Clayton Alexander McCoy

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

9/20/22
Date

[signature]
Andrew R. Szekely, Esq.

**Attachment A**

*The undersigned parties hereby stipulate and agree that the following facts are true and accurate, and that if this matter had gone to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

Clayton Alexander McCoy ("McCoy"), age 32, is a resident of Chesterland, Ohio. As detailed below, McCoy built an explosive bomb in his home in Ohio, and drove the bomb from Ohio to the victim's home in Carroll County, Maryland, intending to kill the victim.

McCoy, originally from Chesterland, Ohio, lived in Maryland from approximately July 2018 to July 2020. McCoy knew the victim, N.K., and a female, S.B., for a number of years, through a live action role-playing battle game/social club known as Dagorhir. McCoy moved back to Chesterland, Ohio, in approximately July 2020. In approximately early October 2020, McCoy expressed romantic feelings for S.B., who informed McCoy that she was in a relationship with N.K.

Following his rejection by S.B., McCoy devised a plan to kill N.K. by building and delivering a victim operated bomb to N.K.'s residence. McCoy used the internet to research the materials and plans for making the victim operated pipe bomb. McCoy traveled to multiple hardware and other stores and purchased a variety of substances to make explosive powder, as well as the other components to manufacture the bomb. The bomb components included the following items: a 12 inch pipe made of galvanized steel, cast iron end caps, white Teflon tape, washers, an extension spring with hooks, spring with eye bolt attached, screws, metal pin, metal washer, wood block with fasteners, zip tie pieces, shrapnel (cut metal triangles and bb's), white paper, a white cardboard gift box, a Lowe's cardboard box, red ribbon, shipping label, glow in the dark tape, and a clear trash bag.

McCoy paid for the materials in cash in order to prevent law enforcement from connecting him to the bombing of N.K. In a further attempt to avoid detection by law enforcement, McCoy purchased single items from multiple hardware stores and paid in cash. McCoy made shrapnel for the inside of the bomb by using an angle grinder saw to cut scrap metal into small, triangular pieces. McCoy inserted the homemade shrapnel (pictured below) and bb's, into the metal pipe, to increase the deadliness of the pipe bomb when it exploded.

 

McCoy designed the bomb to detonate when the package was opened. McCoy placed the homemade bomb into a white gift box, tied a red ribbon around the box, and armed the firing mechanism so that the bomb would explode when the gift box was opened. McCoy placed the gift box containing the bomb into a larger cardboard box he bought from a Lowe's hardware store. McCoy turned the Lowe's box inside out to hide the Lowe's logo and create the appearance of a standard shipping box. McCoy created a printed label addressed to N.K. at N.K.'s residence in Carroll County, Maryland, with no return address. McCoy designed the label, pictured below, to resemble a chain shipping company:

Prior to delivering the bomb to N.K.'s residence, McCoy made a prototype of the bomb, and tested the bomb in his yard to make sure it would detonate.

McCoy also searched the internet to learn N.K.'s residence, and then researched the amount of gas he would need to drive from his home, to N.K.'s residence, and back. One of the searches was on October 23, 2020: "1994 toyota pickup gas tank capacity".

In the early morning hours of October 30, 2020, McCoy placed the homemade bomb in the back of a pickup truck, and drove to Maryland. McCoy selected a route that avoided tolls in order to avoid detection by law enforcement. Starting at approximately 1:24:41 a.m., McCoy used Google Maps to search for and obtain directions to N.K.'s address. Over the next approximately

7 hours, McCoy traveled from Ohio to Manchester, Maryland, and made stops along the route at gas stations and/or food stores. McCoy entered N.K.'s neighborhood at approximately 8:18 a.m., circled around the neighborhood once, and then stopped in from of N.K.'s house – just prior to 8:30 am. To disguise his appearance, McCoy put on glasses and pulled up a hood as he got out of his truck. McCoy placed the box containing the bomb inside a clear plastic trash bag (to prevent the box from getting wet in the rain) and walked to the front door, where he placed the bomb on the front porch, then returned to his truck and drove back to Ohio. McCoy intended for N.K. to open to box, detonate the bomb, and to cause N.K.'s death.

N.K. lived at the Manchester residence with his grandmother, D.M., born in 1955, and his grandfather, J.M., born in 1937. At approximately 8:30 a.m., J.M. saw the gift box inside a clear plastic bag on the front porch. J.M. went on the porch and picked up the box, removed it from the bag, and placed the box on the kitchen to await N.K.'s return. N.K.'s grandparents spent the day in their home, including eating meals and spending time in the kitchen, while the bomb sat on the kitchen table. At one point during the day, another resident of the house picked up the box from the kitchen table and shook the box in an attempt to determine what had been delivered for N.K.

At approximately 5:30 p.m., N.K. returned home and observed the cardboard box that was addressed to him. N.K. opened the cardboard box and observed the smaller white box with a red ribbon inside. N.K. texted his girlfriend to ask her if she had sent him a present, and took both boxes into his bedroom to open his "gift" in private. As N.K. opened the gift box, the bomb detonated. N.K. heard a whistling/hissing sound followed by a loud explosion. N.K. was struck in the front of his body by shrapnel and sustained multiple injuries to his chest, legs and front of body. One end cap of the bomb expelled through N.K.'s bedroom wall, through the exterior wall of the house, and struck a shed, approximately 30 feet from the house. The second end cap struck a stud in the residence causing structural damage, and continued through the room where J.M. was seated.

N.K. was transported to the York Trauma Center where he was treated for injuries caused by the shrapnel and explosion. The injuries included numerous wounds to his arms, torso and legs, and both of his ear drums were shattered. N.K. was transferred to rehabilitation center and released on November 17, 2020. N.K. used a walker to get around for two weeks following the explosion. N.K. had multiple surgeries to remove shrapnel from his body, and another surgery on his hand in January 2020. Multiple pieces of shrapnel remain inside N.K.'s body.

The explosion at N.K.'s residence, owned by his grandparents, caused an estimated $46,690 of damage to the dwelling and contents, and the house was uninhabitable until March 2021. N.K. and his grandparents were forced to move out of their home and to live elsewhere while the house was under repairs. State Farm Insurance suffered a loss of $70,061.26 as a direct result of the explosion.

On March 10, 2021, investigators executed a search warrant at McCoy's residence in Chesterland, Ohio. Items seized from McCoy's residence included the materials he used to make the explosive powder, Lowes boxes, fluorescent tape, red ribbon, and other materials used in the manufacture of the bomb. McCoy was advised of his *Miranda* rights and voluntarily spoke to

investigators. McCoy admitted knowing N.K., but denied knowing where N.K. resided in October 2020. McCoy claimed to have heard about the bombing of N.K. through mutual friends in the Dagorhir social circle, but denied having any role in the bombing. During the interview, McCoy named another individual from the Dagorhir group who McCoy claimed did not like N.K. After investigators showed McCoy maps of his movement on the day of the bombing that showed McCoy traveling from Ohio to N.K.'s residence and then back to Ohio, McCoy admitted that he made and delivered the bomb. McCoy's statements included the following:

- McCoy admitted to making the bomb and that he intended to kill N.K.;
- McCoy wanted to kill N.K. to remove him as a romantic rival;
- McCoy provided details about how he learned to make the bomb, including the explosive powder and the detonator;
- McCoy made the purchases from different stores and paid cash to avoid detection;
- McCoy made the triangular shrapnel by cutting scrap metal, and put the shrapnel and the bb's in the pipe to kill N.K.;
- McCoy made a smaller version of the bomb and tested it successfully;
- McCoy found N.K.'s address on the internet;
- McCoy chose a route with no tolls to avoid detection;
- McCoy was aware that N.K. lived with his grandparents;
- McCoy parked in front of N.K.'s residence and placed the bomb on the front porch;
- McCoy as a result of his prior felony conviction, he was prohibited from possessing firearms and explosives.

McCoy was convicted of Pandering Obscenity Involving a Minor in March 2013, a crime punishable by imprisonment for a term exceeding a year, in the Geauga County (Ohio) Court of Common Pleas. McCoy was sentenced to 4 years imprisonment on May 16, 2013, and is currently on the Ohio sex offender registry.

The homemade pipe bomb manufactured, possessed, and used by McCoy was a container filled with an incendiary explosive that was designed to explode. As such, it is an explosive bomb and a destructive device as defined in 26 U.S.C. § 5845(f)(1)(A) and is therefore a firearm as defined in 26 U.S.C. § 5845(a)(8). The defendant agrees that he knowingly possessed the bomb, knowing the characteristics of the bomb, and that the bomb was in operating condition. The bomb was a National Firearms Act firearm, and was not registered to the defendant in the National Firearms Registration and Transfer Record.

I have reviewed the foregoing Statement of Facts with my attorney, understand it, agree with it, and do not wish to change any part of it. I further understand that it is included as a part of my plea agreement with the government in this case.

[signature]

Clayton Alexander McCoy

      I am the attorney for the defendant. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

Andrew Szekely, Esq.
Counsel for Defendant